UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SETH IAN RUBINSON,<br><br>        Plaintiff,<br><br>vs.<br><br>HARVEY CHARLES RUBINSON,<br><br>        Defendant. | Case No. 9:20cv80527<br><br>**CIVIL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Seth Ian Rubinson ("Plaintiff" or "SIR"), whose primary office address is 1135 Heights Boulevard, Houston, TX 77024, files this Complaint against Defendant Harvey Charles Rubinson ("Defendant" or "HCR"), alleges as follows.

## I.  THE PARTIES

A.  *Plaintiff*

1. SIR is a practicing attorney licensed to practice in the states of Florida, Texas, and Massachusetts (admitted in every federal district court of these states and the First and Eleventh Circuit Courts of Appeal) with a primary office in Houston, Texas, and a Martindale-Hubbell Peer Review Rating of AV Preeminent.

2. SIR is a resident of Harris County, Texas and is son of HCR.

B.  *Defendant*

3. HCR is a Senior Financial Operations Manager and Organization Restructuring Expert and most recently served as full-time chief financial officer of Micelle Biopharma

("Micelle"), an integrated pharmaceutical company that focuses on developing and marketing a variety of products with specialization of development of Lipophilic pharmaceuticals.

4. HCR formerly held roles of interim CFO and COO while working for AlixPartners LLP and XRoads Solutions Group for business entities having revenue range from $15 million to $800 million, which positions include Interim Chief Financial Officer positions for Bally Total Fitness and Pabst Brewing.

5. HCR, as he did while employed with Micelle Biopharma, operates his own independent turnaround and management consulting to the current day.

6. HCR is a resident of Palm Beach County, Florida, and is father of SIR.

## II.  JURISDICTION AND VENUE

7. This Court has original jurisdiction under 29 U.S.C. § 1332 because there is diversity between the parties and the amount in controversy exceeds $75,000.00.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred here.

## III.  JURY DEMAND

9. Plaintiff demands a trial by jury in this action.

## IV.  FACTS

10. SIR is father to a minor daughter who is developmentally delayed and medically fragile arising from a profoundly rare Grade IV intraventricular hemorrhage suffered as a neonate and requiring a lifetime of direct care and financial support.  SIR's daughter attends a highly specialized private school in Houston for developmentally delayed children with learning ability which she shall attend until 21 years of age, thereafter continuing to reside with SIR and relying on SIR's income for her lifetime.

11. HCR, shortly after the passing of his wife and SIR's mother in March 2018 became engaged as management consultant with Sancilio Pharmaceuticals ("Sancilio") in Riviera Beach, Florida, a then-promising pharmaceutical company developing a new medication for sickle-cell anemia.

12. However, Sancilio filed for bankruptcy in 2018 and was acquired in bankruptcy by Micelle ("Micelle"), which continued Sancilio's operations in Riviera Beach with the hope of bringing the under-development sickle-cell medication to market.

13. Micelle was purchased out of bankruptcy by a group of prominent Nashville, Tennessee, businessmen. These individuals included Pete DeLay, former chairman of Sherman-Dixie Products; John P. Mayo, Chief Executive Officer of Surface Sensing Technologies and Thermal Diagnostic Technologies; and Dr. Harry Jacobson, former Vice Chancellor for Health Affairs at Vanderbilt University and CEO of Vanderbilt University Medical Center.

14. HCR was engaged by Micelle to be its Chief Operating Officer with a primary responsibility of overseeing daily operations at the Riviera Beach facility and workforce reduction (i.e.., termination of employees) in an effort to restore profitability.

15. During the course of his role as COO of Micelle, HCR developed a close relationship with Messrs. DeLay and Mayo, while alienating Dr. Jacobson basically posturing Dr. Jacobson to DeLay and Mayo as prone to fraudulent conduct.

16. HCR, throughout the lifetime of SIR, maintained regular communication with SIR and, importantly, was utterly reliant on SIR for virtually every aspect of technology whereas HCR is technologically illiterate, ranging from purchase, configuration, and operation of his mobile devices such as iPhones and iPads, to installation of software, problem diagnostics, network configuration, and regular maintenance of his computers. Throughout the lifetime of

HCR using email, SIR provided the courtesy to his father, HCR, of purchasing and maintaining email service to HCR as part of SIR's family email plan, as well as eventually creating, registering, and continually paying for the "HCRTURNAROUND.COM" internet domain registration.  At all times, the harvey@hcrturnaround.com email account was an account owned, serviced and maintained by SIR as part of SIR's family email account plan.  SIR also at all times provided payment for the email services, as well as performed frequent maintenance on the account at the request of HCR each time he required the account to be active on a new device or computer.  At no time did HCR have a website for his consulting business and the HCRTURNAROUND.COM domain has at all times been registered to, maintained, and paid for by SIR.

17. Furthermore, whereas SIR is an attorney practicing in the State of Florida, HCR always turned to SIR for any and all legal matters relating to HCR's personal and business affairs, whether of the most mundane or critical nature, from addressing contractors issues at his home to serious business disputes and other material legal affairs.

18. However, when HCR accepted the position of COO of Micelle and developed a very close relationship with the Nashville based investment group that purchased Micelle out of the Sancilio bankruptcy, HCR for all intents and purposes terminated communication with SIR. SIR, on the infrequent occasions he was able to communicate with his father, HCR, would consistently receive report from HCR that his work with Micelle would be of a limited duration and that any opportunity for financial gain from the company was extremely limited.

19. Importantly, although HCR's role was specially to oversee operations and personnel at Micelle's base of operations in Riviera Beach, HCR would state with high frequency that he was "in Nashville" working with Micelle to the extent SIR was led to believe

by HCR's express statements that HCR was virtually residing in Nashville and rarely in Florida, which upon information and belief was untrue whereas the only connection to Nashville is that Micelle's investors, resided in Nashville and infrequently would hold board meetings in Nashville that HCR would possibly infrequently attend.

20.     Over time, HCR endeared himself to Pete Delay and John Mayo, frequently referencing that he was the grandfather of SIR's daughter, who requires extensive lifetime financial support in order that she can attend a private school for developmentally delayed children with learning ability in Houston, which she shall will attend until 21 years of age, thereafter requiring a lifetime of financial and care support.  HCR would also consistently reference that SIR's daughter suffered from debilitating epilepsy.

21.     Eventually, when HCR requested SIR's assistance in servicing the harvey@hcrturnaround.com email account to create a required device specific password, SIR encountered what were life-changing and mentally debilitating emails sent to Jiang Liang, managing director of AppleHelix Bioventures and a New York-based business influencer/venture capitalist who was selected by the Micelle board of directors to raise capital for Micelle in order that Micelle could continue its efforts to bring its under-development sickle cell pharmaceutical to market.

22.     Within these emails, HCR explained that John Mayo and he worked very hard to have Liang selected as the individual to raise capital for Micelle and implored Liang to provide him substantial interest in what was to be a newly-formed entity created with venture capital brought by Liang.  Within one email communication of March 8, 2019, HCR stated in part that he requested an appreciable interest in the company because he used his retirement savings in an effort to provide experimental cancer medications for HCR's wife and SIR's mother, in addition

to "[HCR's] continuing financial assistance for [SIR's] daughter who had a brain bleed at birth and has severe epilepsy. The financial support is necessary so she can attend a wonderful special needs school in Houston."

23. These statements were utterly false. Not only has HCR never provided a single dollar of support for SIR's daughter's education, but further, SIR was enlisted by HCR during HCR's wife's and SIR's mother hospitalization for cancer treatment to ensure that HCR had no monetary exposure to treatment and that all experimental treatments were provided without cost under Jackson Memorial Hospital's compassionate use program. Further, after the passing of HCR's wife and SIR's mother in March 2018, HCR again enlisted SIR to ensure that no amounts of money could be collected from HCR for treatment provided to HCR's wife and SIR's mother despite the aggressive collection efforts of Jackson Memorial Hospital. Adding to the traumatic nature of HCR's efforts to use SIR's daughter for financial gain was the fact that throughout SIR's life, notwithstanding his success as an attorney, when financial strain arising from EER's dangerous medical condition and developmental disabilities were such that SIR would request financial assistance from HCR years ago, any amounts provided by HCR for financial assistance associated with his granddaughter were loans for which HCR kept strict records and required repayment from SIR.

24. Mr. Liang, believing HCR to be a benevolent benefactor to SIR's daughter, responded to HCR on March 8, 2019, "I am so sorry to her that!!!! I will double it 0.5% post-money and, if the drug works, probably worth at least >$10m…." Mr. Liang went on to state, "GOD bless you too Harvey!" Mr. Liang even went on to further state, "BTW Harvey, one of the indications I want to try with [the new medication] is pediatric epilepsy!" SIR's daughter suffers from refractory epilepsy that leads to frequent life-threatening *status epilepticus*, a state

of continuous seizure that has placed SIR's daughter's life at risk literally hundreds of time by uncontrolled and unstoppable seizures requiring frequent 911 response with ICU level ambulance or helicopter transport.  SIR was a director of the Epilepsy Foundation of Florida and a significant contributor of time and money to the cause of finding a cure for epilepsy and supporting the epilepsy community in Florida.

25. HCR restated the same defamatory falsehoods to Mr. DeLay on May 24, 2019, stating to Mr. DeLay that he was not in a position to make certain recommended real estate investments because, in pertinent part of HCR's "continuing financial assistance for my older son's daughter who had a brain bleed at birth and has severe epilepsy. The financial support is necessary so she can attend a wonderful special needs school in Houston."  HCR within the same email and premised upon his purported continuing financial assistance to SIR's daughter requested a performance bonus from Mr. DeLay.

26. HCR committed on July 20, 2019, what was the pinnacle of defamation and injury to SIR when he emailed Mr. Liang, pressing for written agreements providing HCR with generous percentages in the company being formed by Mr. Liang for development and marketing of the prospective new sickle-cell medication:

> Hi Jing,
>
> You mentioned while I was driving you to the airport two weeks ago that you would send me a letter describing my agreement with Heliomebio since Matthew Weill has not sent me any documentation. I hate to bother you, but I am only asking you now because my bi-polar son's wife called me this morning asking for money and my son with the brain damaged daughter is also asking me for money even though they know that I used almost all of my retirement savings paying for experimental cancer treatments in an attempt to save my wife's life. Thank you for your consideration in this matter.
>
>  Best regards,  Harvey

27. Consequently, by July 20, 2019, HCR not only defamed SIR by communicating to Pete DeLay and Jing Liang that HCR provided "continuing financial support in order that" SIR's developmentally delayed daughter could receive the private education she receives as a result of the tireless hours worked by SIR as an attorney to provide his daughter's education and lifetime care, but now further defamed and personally injured SIR by layering lie upon lie so as to posture SIR as not only unable to provide for his special needs daughter without HCR's purported support, but as a compassionless victimizer pressing HCR for money to support SIR's "brain damaged" daughter even though HCR had purportedly "spent his retirement savings" trying to save SIR's mother. Literally, HCR layered one lie on top of another to endear himself to DeLay and Liang for personal financial gain whereas he not only never supported SIR's daughter's education, but also retained SIR to prevent HCR from having to spend any money for the cancer care of HCR's wife and SIR's mother.

28. Therefore, by July 2019, in order to garner the undeserved appreciation of DeLay and Jiang for generosity never provided and for personal financial gain, HCR postured himself as a benevolent, giving man who not only provided financial support to SIR (absent which HCR asserted SIR's daughter could not attend her private school), and went on to inhumanely defame and injure SIR by further communicating to third-parties that *even despite his purported benevolent support of SIR's daughter, he was being "victimized" by SIR for additional money notwithstanding HCR purportedly spent his retirement savings trying to save SIR's mother*. That is, by July 2019, in order to realize personal financial gain, HCR not only painted SIR as unable to support his family without HCR's "continuing financial assistance," but went on to literally paint SIR as a monster who pressed HCR for *even more purported money* despite HCR's

purported heroic efforts to save SIR's mother; lie after lie for personal gain at the expense of SIR's reputation and mental health.

29. HCR, after sending the July 20, 2019, email to Mr. Liang asserting that he urgently required written agreements reflecting ownership in AppleHelix Bioventure I, LLC (a company formed by Mr. Liang for purposes of the sickle-cell medication development and marketing) because of SIR's purported demands for additional financial support, was promptly provided and entered into a complex Stock Option Award Agreement providing HCR with generous company ownership.

30. Contrary to his course of conduct since SIR commenced the practice of law in 1997, HCR did not tell SIR of or seek the assistance of SIR as to legal review of the stock option agreement. Instead, HCR maintained complete silence as to any of these events and, on those extremely rare occasions on which he spoke with SIR, simply referenced the poor condition of Micelle and the likelihood that his employment would soon be terminating, all while continuing to reference his constant presence in Nashville, Tennessee, as opposed to his residence in Lake Worth, Florida (minutes from the Riviera Beach pharmaceutical facility of which he was in charge on a daily basis).

31. When confronted by SIR as to the horribly false and defamatory statements made about him by HCR (whereas SIR works incredibly long hours operating his own legal practice to provide for the education and lifetime financial dependence of his daughter), HCR became infuriated and threatened that if SIR took legal action, HCR would contact SIR's clients to accuse him of "elder abuse," a Florida statute intended "to provide additional protection for individuals sixty years of age or older when the infirmities of aging result in a dysfunction that impairs their ability to provide adequately for their own care and protection. Even if a person is

sixty years of age or older, a person does not qualify as an 'elderly person' within the meaning of the statute if he or she does not have an age-related impairment of his or her "ability ... to provide adequately for the person's own care or protection." *Watson v. State*, 95 So. 3d 977, 981–82 (Fla. 2d DCA 2012). Sadly, SIR would be the second of HCR's two sons faced with such baseless accusations, but in the case of SIR's sibling, HCR actually sought the arrest of SIR's sibling and had him incarcerated by the Palm Beach County Sheriff for an extended period of time, removing SIR's sibling from his wife and child and forever damaging his earning potential.

32. Consequently, when confronted with his defamatory and exploitative behavior, HCR, Chief Operating Officer of a pharmaceutical company with six-figure compensation who lives independently in a luxury Lake Worth gated community and whose responsibilities included the complete reorganization of the company (including termination of most of the company's employees), threatened to accuse SIR of "elder abuse" under Florida law if SIR pursued the instant legal action against HCR.

33. SIR stated that he did not wish to have to pursue legal recourse against HCR, but demanded that HCR immediately send emails with carbon copy to SIR fully retracting his statements to Messrs. Liang and Delay concerning both support of SIR's developmentally delayed daughter, as well as using his purported retirement funds for life-saving measures for the cancer care of SIR's mother, but HCR refused to do so, claiming that he placed telephone calls to Messrs. Liang and Delay retracting his defamatory statements.

34. HCR to this current day, at 77 years old, remains an active management consultant seeking new opportunities and is believed to be engaging with Messrs. Delay and Mayo as to new prospective business ventures to serve in an executive capacity.

35. Despite extensive efforts by SIR to do so, SIR was unable to reconcile the relationship and compelled to bring the instant action.

## COUNT I
### (Defamation Per Se)

36. SIR incorporates paragraphs 1 through 35.

37. HCR, by falsely communicating in writing to Pete DeLay and Jiang Liang that he provided ongoing financial support to SIR in order that SIR's developmentally delayed and medically fragile daughter can continue to attend her private school in Houston, Texas, defamed SIR by stating that SIR is unable to provide for his daughter's education and welfare without the assistance of HCR notwithstanding that HCR does not and has not provided support to SIR for the benefit of SIR's daughter's education or otherwise.

38. HCR, by falsely communicating in writing to Jiang Liang that he was in urgent need of a stock option agreement because SIR was pressuring him for money despite that HCR had purportedly spent his retirement savings in a falsified heroic effort to save SIR's mother from terminal cancer defamed SIR by posturing SIR as a compassionless victimizer unable to provide for his family whereas HCR does not and has not provided support to SIR for the benefit of SIR's daughter's education or otherwise and, additionally, expressly retained SIR to ensure that HCR did not expend money for SIR's mother's cancer care and that efforts by Jackson Memorial Hospital to collect money from HCR for that care were terminated.

39. The defamatory statements made by HCR about SIR tend to subject SIR to hatred, distrust, ridicule, contempt or disgrace; and/or tend to injure SIR in his profession as lawyer in the states of Florida, Texas, and Massachusetts whereas the hallmarks of an attorney include

trustworthiness and professionalism and SIR is a Martindale-Hubbell AV Preeminent attorney whose incomes relies on the trust and confidence of his clients.

## COUNT II
### (Intentional Infliction of Emotional Distress)

40. SIR incorporates paragraphs 1 through 35.

41. HCR's defaming of SIR in the manner set forth above constitutes deliberate or reckless infliction of mental suffering upon SIR.

42. HCR's defaming of SIR in the manner set forth above constitutes outrageous conduct.

43. HCR's outrageous conduct as described above caused and continues to cause SIR severe emotional distress.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Seth Ian Rubinson requests that the Court grant him the relief requested as follows:

A. An award of damages to be determined at trial to compensate Plaintiff for all non-monetary and compensatory harm, including, without limitation, compensation for the defamation *per se* of Plaintiff and emotional pain and suffering.

B Such other and further relief as the Court may deem just and proper.

Dated:  March 29, 2020                                         Respectfully submitted:

**RUBINSON LAW**

 /s/ Seth I. Rubinson
Seth I. Rubinson (Fla. Bar No. 137413)
1135 Heights Boulevard
Houston, TX  77008
(305) 763-9005
srubinson@rubinsonlaw.com